This appeal raises two issues of unsettled law that are critical to prosecution before the United States Patent Office. The first issue deals with what this court's requirement means when it says that evidence of unexpected results must be commensurate with the scope of a claim. I will show that when a claim comprises multiple embodiments, none of which but one are prima facie obvious under the prior art, that the evidence of unexpected results need only address that one embodiment in order to show that the claim as a whole is non-obvious. The second, if pure issue of law, deals with this court's admissions as prior art doctrine. I will show that unless an admission uses the term prior art in those exact words, if of a relevant portion of Section 102 in order to constitute an admission of prior art. Mr. Cardone, we have a claim here for the preamble, and we don't yet have to get into whether it's controlled or not. Hydraulic fluid comprising a lubricant consisting of at least one phospholipid and askew deals with hydraulic fluid with phospholipids principally, claims there's a second lubricant comprising an alkoxylate salt, and Mueller is also dealing with lubricant additives, and the principal component there are alkoxylate salts, and steer rates are especially mentioned, and the third component is to be free of an oil, and I think that's certainly in one of these references, the 0.1%. Why isn't there a premonition case of obviousness here? Well, Your Honor, that was the examiner's assertion, and I would disagree with the examiner for the reason that Mueller is not a hydraulic fluid. It discloses a drilling fluid, which is about as similar to a hydraulic fluid as Kaplan is to windshield wiper fluid, insofar as they're both using the same machinery, but otherwise bear no resemblance to each other. The main problem with the examiner's prima facie case is that it proves Mueller dealt with additives for drilling fluids, isn't that in the same field? It's in the same field as so far as drilling, hydraulic fluids are also used in offshore drilling, but they don't serve the same purposes, a drilling fluid is thrown down into the hole that the drill rotates in, a hydraulic fluid is used in the machinery to move power and displace metal. They're not similar fluids, they are just using the same machinery, and for that reason there's a finding that it's in the same field of endeavor, but that's not sufficient to create a prima facie case. The lubricant that Mueller uses primarily is silica, and that would clearly not be useful in a hydraulic fluid. And so the main problem with the examiner's case is that in order for an applicant to get a combination patent, we would have to invent an entirely new lubricant that's never been used in any application in the world. So the examiner's reasoning can apply to any lubricant known ever for any other application. It could apply to bicycle chain grease, Teflon powder, cooking oil, anything, and for that reason it proves too much under this course precedent in Ray Cuban, which says that when you're really throwing metaphorical darts at the board, that can't create a prima facie case of obviousness. They're just choosing from the whole world of lubricants, and that can't suffice to show obviousness. It risks too much hindsight. But to get to the story of commensurateness, and that's the rebuttal evidence here, the claim, the applicant has to prove that embodiments that aren't prima facie obvious, Mueller only discloses calcium with stearate. It doesn't disclose any other alkoxylate. Additionally, the board relied on admissions of prior art dealing solely with calcium stearate to make this prima facie case. So therefore, the prima facie case dealt solely with calcium stearate. Our evidence of secondary factors dealt with calcium stearate and showed that when calcium stearate is used, it produces unexpected results. Now, the board held that wasn't sufficient and faulted us for not showing that other alkoxylates that are not mentioned in Mueller or any prior art at issue produce unexpected results. And that is an error of law that under this court's precedent in In re Tiffin and In re Heysen cannot stand. In In re Tiffin, the case that established the commensurateness requirement, the court held that appellant's claims are too broad in the sense of 103 and that they are inclusive of subject matter, which is prima facie obvious and concerning which the appellants have not rebutted the patent office's case. In In re Heysen, the patent office, having made out a prima facie case of obviousness commensurate in scope with the claim, it becomes incumbent on the appellant to rebut that case if he could with evidence of similar scope. So therefore, here, the evidence of secondary factors is the exact same scope as the prima facie case that the patent office made. Now, in other cases, such as In re Piasecki and In re Reinhart, this court has said that the board must make sure to not give its prima facie case an undeservedly broad umbrella effect. And that, I submit, is what the board has done here. The board has said it made a prima facie case and then refuses to acknowledge the narrowness of that case when reviewing our evidence of unexpected results. Of course, your claim is not narrow. Your claim is broad. And disclosure of anything within its scope can render the broader claim unpatentable. I'm looking at so-called evidence of unexpected results. There are a lot of them here. But they're all over the map. And some of them are additive. Lecithin and calcium stearate produce results no better than lecithin itself. And there's a lot of inconsistent data in here. Well, I think the critical point, Your Honor, is that when lecithin and stearate are combined, they produce better results than when used separately. Now, I don't think unexpected results requires us to prove that our composition produces better results than lecithin alone. I think what it requires us to prove is that lecithin plus stearate interact in an unexpectedly synergistic manner. And that's what's shown here. The stearate not only provides lubrication, it also provides stability to the bath, which is something that lecithin does not do. So by using stearate, you're able to get more lubrication plus stability to the bath. Additionally, the examiner looked at this very evidence that you've looked at and found that it did show evidence of unexpected results in at least four instances. And the board has not dealt with that evidence. The solicitor has not dealt with that evidence. No one has addressed it. No one has rejected it. The only error of law is in the finding that we just dealt with stearate, and our claim is broad enough to encompass other types of alkoxylates. Our complaint with that is that the board didn't find any other alkoxylates disclosed in the prior art, and therefore we do not have to rebut that. We don't have to show that our claim... Our claim as a whole is not obvious because embodiments within that claim are not reflected in the prior art, and those that are have been shown to produce unexpected results. Additionally, in KSR, the Supreme Court's exhalation of unexpected results seems to support our position here. They say that when a claim just arranges old elements performing their same function and yielding no more than one would expect from such an arrangement, that that would be obvious. But here, the old elements that we have proven have an unexpected result. So therefore, the other embodiments of our claim, albeit the claim is broad, they don't have to be proven to show unexpected results if no one has realized that they are lubricant jet. So it was agreed by the applicant that claims one and four would be treated as representative throughout the proceedings? Yes, Your Honor. They're the ones that are mentioned in the opinion, but the thought occurs that because they are, shall I say, extremely broad as just a simple combination of two elements that have already been known to be usable in hydraulic fluids. And so there was no attempt to having observed from the data provided, that you provided, that some combinations are more effective than others. That presumably was in this award that claims that, but you're looking for the scope of claims one and four on appeal. Is that right? That's correct, Your Honor. We were looking for the scope of claims one and four. I think claim four narrows the alkoxylate to a... A little to the sheer, yes. Yes. But the entire point here is that the claim is broad, but none of the embodiments of that claim are reflected in the prior art, except for the specific ones that we dealt with with unexpected results. The claim may comprise other phospholipids, but the only phospholipid in the SKU is lecithin. The claim may comprise other alkoxylates, but the only alkoxylate in the prior art is spirit. And we've shown that those old elements, as the Supreme Court and KSR put it, provide unexpected results. And therefore, the claim as a whole is not obvious. Now, I think that the case is controlled by Tiesenke and Reinhardt that say that the pre-mutation case can't be given an undeservedly broadened umbrella effect. How can the board rest on its narrow pre-mutation case and then not consider our evidence that directly rebuts the scope of that pre-mutation case? Additionally, with respect to the prior art admissions issue, the examiner relied solely on a SKU and Mueller. And on appeal to the board, we argued that the examiner's ground of rejection proved too much, that any lubricant in the world would satisfy it, and therefore, it can't possibly be that that would be pre-mutation. It would be as throwing a metaphorical dart to the board. So therefore, the board energized the examiner's findings and found that there was a submission about environmental friendliness of calcium spherate, and it found that that was an admission of prior art. In our application, we were just discussing the background of the invention, the purpose to which our invention was put. And I think the case of in-ray dial chemical coat is directly on point here where the applicant had been experimenting with a heat-resistant rubber, and in the application, he said that it was known that maleic anhydride and sirene provided heat-resistant properties. And the board seized on that language and said, you've admitted that it was known in the art that that was the case. This court reversed, saying that it's not fair to rely on that admission as prior art. You were just discussing the purpose of the work. And furthermore, the applicant had been discussing how other people in the art had failed to create a heat-resistant rubber. And here, we discussed in our application that other people had failed to make a stable, environmentally friendly hydraulic fluid composition. So therefore, I believe that the facts of this case are entirely within the in-ray dial chemical holding, and that it was improper for the board to rely on the admissions of prior art. Okay, let's hear from this solicitor, and we'll save you a rebuttal, Tyler. Thank you. Thank you, Andy. Ms. Kelley. Good morning, Your Honors. May it please the Court. The first thing I'd like to do is begin with something that was said by a opposing counsel at the beginning of his presentation. He said that the drilling fluid differs from hydraulic fluids, and I confess that when I recall that being asserted by appellant. And he then opined that the board was simply choosing from the whole world of lubricants to establish its prima facie case. I think that that description is a bit hyperbolic. First of all, Askew, as correctly noted by Judge Laurie, teaches almost everything. All the elements of this claim to mention, with the exclusion of this alkoxylate salt, but it does teach non-phospholipid ingredients. And then Mueller teaches those other ingredients. Askew is directly in the field of hydraulic fluids. And Mueller, even accepting this, to me, new argument that drilling fluids and hydraulic fluids are very different things, still discloses the use of items on an offshore oil rig. And so this is some giant world, when we're looking at this particular rejection, where we're saying any lubricant at all. Askew has narrowed the world to a very small point, and Mueller is being cited for disclosing something about alkoxylate salt, particularly calcium stearate and magnesium stearate. And that particular thing that he discloses is that these are known per se lubricants. So, I think it was fair to say, fair for the board to find, that something that is a known per se lubricant to Mueller, would be a known per se lubricant to Askew. In hydraulic drilling. In hydraulic fluids. Again, I don't remember that particular argument. If something we agree with you on a prima facie case, what about rebuttal evidence of unexpected properties? The rebuttal evidence of unexpected properties, I'd like to say two things about that. One is, the board did not make its finding that those results were unpersuasive based on this 12 arguments. That was not their primary reason. Their primary reason is that these results were not unexpectedly superior, that they were merely expected additive results. And, as was noted, when the voting council was up here, there were a lot of facts presented and a lot of test results. But, those were apples and oranges. The board correctly said, okay, well where are the results where we have just one part of this solution, one part of this fluid that's different? And, that's a basic scientific principle. When you're testing things and comparing things one to another, you compare apples to apples, you compare solutions where everything's the same except one factor. And, the board said, if you take a solution having 7% lecithin, you're going to get X number of pounds of maximum applied torque. And then, if you take one solution that has just calcium stearate plus the rest of it being the same, you'll get this other... Ethylene glycol. Yes, a model of ethylene glycol being the other predominant component. You'll get this other amount of torque pounds. If you add those two together, the 1,400 and the 1,100, you're going to get 2,500. And, lo and behold, when they tested a solution with 7% lecithin, 7% calcium stearate, and the balance being the model ethylene glycol, it added up to exactly 2,500. I mean, it's the very definition of additive. So, there was no synergistic result here. The other solutions that are referred to in the Smith separation, you just can't compare them one to another because the balance of the solution is different in each one, or they don't even contain components falling within the scope of their claims or the prior art. So, the board correctly said, if you look at the board's decision, if you look at the board's decision at 8-12, the first thing the board said is, they did that to the very math I'm talking to you about. They said, this one has 1,400 pounds and the other one has 1,100 pounds, and if you add them together and this moves over to 8-13, you get 2,500 pounds. That's what you've shown. That's additive. So, what you have was reasonably expected. And then they said, the number, you know, there's this second reason, and you can know it's the second reason because it's this paragraph discussing, it begins with the word, moreover. So, it's the board's way of saying, moreover, even if, you know, we're wrong, I would say, even if it's worth the case, even if these were somehow unexpected, your claims encompass so much more than what these results would indicate are patentable. So, I think these are the two main points of rebuttal here. The other question I think that he raised, or the other issue raised during oral argument, was the information about what was the board doing as far as environmental state, their findings on environmental safety. These were additional findings to those made by the examiner. The board had already went through the prime facie case, and had already said that Mueller disclosed that alkoxylate salts like calcium stearate and magnesium stearate have very good lubricant qualities, and that they were known for safe lubricants. That's already establishing that's the prime facie case. And then they also noted that Mueller and the specification in this case both discussed the need for environmentally safe chemicals for use in offshore oil rigs. That's an irrelevancy, isn't it? Pardon me? That's an irrelevancy. It's irrelevant to whether there's a prime facie case and whether it's been overcome. Yes, and additionally, it's irrelevant for another reason, that finding because, as the board noted in response to the Bogor rejection, the preamble does not limit the claims at issue here to hydraulic fluid. There's nothing in the body of the claims to still limit the claimed fluid to particular uses or ranges of chemicals that somehow, from a structural standpoint, would limit the claimed fluid to a particular use or technology. So for these many reasons, we do not believe that appellant has overcome the prime facie case of obviousness. Do your honors have any questions for me? Any more questions? Any questions, Ms. Kelly? Thank you, Ms. Kelly. Thank you. Mr. Cordani? Thank you. The first issue I'd like to address is that we never discussed the differences between a drilling fluid and a hydraulic fluid. That was discussed very clearly, even in our briefing, especially in our briefing to this board, but even in the briefing to the board. On page 8157 of the appendix, we stated, because the properties that are desired for a drilling fluid to be used to remove rock cuttings and to cool and lubricate a drill bit in a drill pipe are not the same as those desired for a hydraulic fluid. And we can make an argument about the disparity between those types of compounds, so that that's demonstrably false. Secondly, with respect to Begora, I'd like to point out that the board's internally inconsistent findings mandate reversal in this case. The board found that the auxiliaries and other additives in the cosmetic reference, Begora Losas, were not sufficiently described to anticipate a hydraulic fluid. Let's put it down, and let me understand better. One reference deals with hydraulic fluids in the oil and gas industry, and the other, water-based drilling fluids, and they're both lubricants. Why are they in different fields? What's the difference? The difference is that drilling fluids are thrown down a hole in the ground with a drill to lubricate the drill bit as it's rotating. And the other lubricates machinery? It lubricates the drill against the rock. That's what it lubricates. Hydraulic fluids are specialized fluids that you put into the internal machinery of a drill, not the hole. It's the thing that just makes power displacement. But they're used in the same industry, in the same operation, drilling for fluids. They're drilling for oil. Sure, in the same way that gasoline and windshield wiper fluids are used in automobiles. I wasn't struck by that. I would never have expected my windshield wiper fluid to smell like gasoline. They don't seem very interchangeable. I don't think drilling fluids would smell anything like hydraulic fluids. They contain very different compositions. We just claimed a specific aspect of the hydraulic fluid that requires lubrication. Hydraulic fluids also contain other components that are nothing like drilling fluids. They do very different things. Additionally, with respect to this evidence of unexpected results, the examiner examined this evidence and found that it showed unexpected results. I think if you look at that evidence, we held everything constant. We tested one composition with lepidin, one with calcium stearate. In order to assess those results, you have to look at both the amount of torque required to spin the pin and the applied load. If you look at those results, the amount of torque required to spin a pin under this pressure is less when lepidin and stearate are combined. The way the board looked at it was erroneous and not the way the examiner looked at it. The board never explained why the instances that the examiner found to show unexpected results were improper. In fact, the examiner found that if our claims were limited to certain concentration ranges of lepidin and calcium stearate, then they would be patentable. They would have been issued. Therefore, I think that... None of those claims are before us, right? There was no attempt to narrow the claims. I do think a good deal of the difficulty is the breadth, certainly, of Claim 1. No attempts were made to narrow the claims, but the reason we appealed was that we thought that there was an error of law. The error of law was in finding that we had to prove that other alkoxylate salts provide these unexpected results. The tests were very expensive to do, and we thought it would be better to appeal that issue of law because the examiner and the board had given their prima facie case an undeservedly broadened umbrella effect. When they assessed the evidence that we had presented, they only assessed it against the conclusion that the claim was prima facie obvious. They didn't go back and think about how they came to that conclusion, which was on very narrow grounds. Now, it would seem completely unfair to require us to prove other alkoxylates produce unexpected results. In other words, you wanted to argue an issue rather than accept protection for your invention. Oh, well, I think, Your Honor, we would make a continuation application, but we were seeking to get as broad a protection as possible, but we would make a continuation application to get whatever we can get. But I think this issue of law is important, and I think it's important to practice before the PTO, and for that reason, I ask for a reversal. Thank you, Your Honor. Okay. Any more questions? Any more questions? All right. Thank you, Mr. Cordani and Ms. Kelly. The case is taken under submission. That concludes the argued cases for this morning. All rise.